Cynthia Anne BRINKER and Brenda Lee Brinker, Appellants,

v.

WOBACO TRUST LIMITED et al., Appellees.

No. 8766.

Court of Civil Appeals of Texas, Texarkana.

Sept. 19, 1980.

Rehearing Denied Nov. 18, 1980.

Charles P. Storey and Donald A. Swanson, Jr., Storey, Armstrong, Steger & Martin, Dallas, for appellants.

John H. McElhaney, Dallas, for guardian ad litem.

William C. Koons, Koons, Smith & Johnson, Dallas, for Magrit F. Brinker.

Morris I. Jaffe, Gardere, Wynne & Jaffe, Dallas, for Norman E. Brinker.

George C. Chapman, Thompson & Knight, Dallas, for Dallas Comm. Chest.

Mark Martin and Michael A. McClelland, Strasburger & Price, Dallas, for First Nat. Bank.

Robert S. Mizell, Taylor, Mizell, Price, Corrigan & Smith, Dallas, for holding companies.

CORNELIUS, Chief Justice.

This suit was brought by Cynthia and Brenda Brinker, the daughters of Norman E. Brinker and Maureen Connally Brinker, deceased, to construe or reform three trust instruments so that children born to Norman Brinker's second marriage would be excluded as beneficiaries of the trusts, and to impose a constructive trust on certain assets removed from Maureen Brinker's estate and placed in a Bahamian trust which included children of the second marriage.

In a bench trial the court refused to admit evidence seeking to establish Norman's and Maureen's intention in creating the trusts, or to show that in the drafting of the trust indentures a mistake had been made which would warrant reformation of the instruments to reflect the true intention.

Cynthia and Brenda are the only children born to Norman and Maureen Brinker. Maureen died on June 21, 1969. Norman married Magrit Fendt in 1971, and they had two children, Christina and Mark, before their marriage ended in divorce in 1977.

While Norman and Maureen were married they decided to establish a trust. The trust indenture named Norman as the "settlor" and Maureen and the First National Bank of Dallas were collectively named "trustee". The trust was designated the "Norman E. Brinker Family Trusts", and was to be funded principally by proceeds from insurance policies on Norman's life. As it developed, however, Maureen died first. In her will she bequeathed $65,000.00 to a testamentary trust for her children and left the rest of her estate to a residuary trust created in the will, the assets of which, after her mother and Norman died, would "pour over" into the Brinker Family Trust, "to be held or disposed of in accordance with the provisions of Article IV" of said trust. Article IV of the Brinker Family Trust provides that if the settlor's wife predeceases him, the trust principal and income shall be paid to "the issue of settlor". In 1970, after Maureen's death, Norman created two other, separate trusts for the benefit of Cynthia and Brenda, and presumably funded them with monies or properties from his share of the community estate. Those trust indentures name Norman Brinker as settlor, and provide that if the principal beneficiary dies without issue, the trust assets will be paid to "settlor's issue then living."

When Maureen died her net estate was valued at approximately $700,000.00. In 1973, when Norman was married to Magrit and they had one child, Maureen's estate as contained in the residuary trust, consisting principally of stock in Steak & Ale Restaurants, Inc., had grown much larger. At that time, Norman, who was trustee of the residuary trust, conferred with his attorney and decided on a plan to divide some of Maureen's estate with the children of the second marriage, and also take advantage of some tax saving opportunities. To effectuate the plan, Norman transferred assets from Maureen's residuary trust and placed them in the Wobaco Trust, a trust he created through the World Banking Corporation located in the Bahamas. Norman's attorney advised him at the time of this transfer that there was a risk of complaint by Cynthia and Brenda when they became adults, but he chose to proceed. After his second marriage ended in divorce, Norman had second thoughts about his transfer of the residuary trust assets to the Wobaco Trust, and he told Cynthia and Brenda what had been done. Although the residuary trust in Maureen's will has not yet poured over into the Brinker Family Trust, when Cynthia and Brenda became aware of the transfer of the residuary trust assets to a trust benefiting the children of the second marriage, they brought this suit seeking to establish that they and their descendants are the only beneficiaries of the Brinker Family Trust, as well as the other two trusts created for their benefit, and to impose a constructive trust upon the assets transferred to the Wobaco Trust on the grounds that those assets eventually will belong to them exclusively when the pour over provision becomes operative.

On a bill of exceptions, appellants produced evidence that Maureen and Norman Brinker intended for the trusts to benefit only the issue born of their marriage to each other, and that if the term "issue of settlor" as used in the trust indentures meant the issue of Norman Brinker by any other union, a mistake had been made in the drafting of the trust indentures which warranted reformation of the instruments. The evidence consisted of the testimony of Norman Brinker and Mr. Robert Taylor, a tax lawyer who prepared both the trust indentures and Maureen's will. The evidence may be generally summarized as follows: Mr. Brinker testified that he and

Maureen primarily wanted to be certain that whatever assets went into the trust would go for the benefit of their two children at that time, i. e., Cynthia and Brenda. He said they knew Maureen could not have any other children and that they intended for the trust to be just for Cynthia and Brenda. He further testified that neither he nor Maureen was familiar with trusts or wills or legal terminology, and that they depended entirely on their lawyer to correctly put into the trust instruments what they wanted done; that neither he nor Maureen chose to use the word "settlor" or even knew what it meant; that the word was never mentioned or discussed with their lawyer or the bank; and that although they read the trust instruments before executing them they did not understand them, and in effect told their lawyer, "You are the lawyer; we don't understand this, did you do what we asked you to do?", and upon the lawyer's assurance that he had, they completed the transaction. Mr. Taylor testified in detail. He testified that the Brinkers instructed him to prepare the family trust; in the discussion it was mentioned that Maureen could not have any more children; he understood that they wanted only Cynthia and Brenda to share in that trust; and that was the way he intended to draw the instruments and thought he had done so. When asked if either Norman or Maureen said anything about wanting to include children who might be born of other marriages, he answered "No, just the opposite", although he admitted that they did not specifically tell him to cut out all afterborn children. He further testified that if the trust indentures were written so as to include other children as beneficiaries, he had made a mistake in drafting the trust instruments. Upon being questioned about Norman alone being named settlor, Mr. Taylor stated that he considered Maureen to be a co-settlor, and had intended to designate her as such in the same manner as he had designated her and the bank as co-trustees, and that was the reason he had her execute the trust indenture along with Norman. He also recalled that Maureen discussed with him the possible remarriage of her husband and that she shared "the normal concern of a wife that her husband, if something happened to her, might remarry and reiterated that she wanted her property to go to Cindy and Brenda." On cross-examination appellees brought out concessions from Mr. Taylor that the trusts did benefit Cynthia and Brenda, which literally complied with the directions he received from Norman and Maureen, and that the Brinker Family Trust indenture did not contain typographical errors, but contained the actual words he dictated. On the suggestion that many corrections would be necessary to change the trust indenture to designate Maureen as co-settlor, Mr. Taylor disagreed and said he intended to so designate her and then use the singular of the word "settlor" to refer to both Maureen and Norman as he had done with the singular word "trustee" to refer to Maureen and the bank. Other features of the drafting and signing of the trust indentures were pointed out which could be construed to impeach Mr. Taylor's testimony that a mistake in the drafting had been made.

The foregoing summary demonstrates that a fact issue was made on the question of mistake in the drafting of the trust indenture to correctly express the parties' intention. The evidence raising such issue should have been admitted on appellants' plea for reformation.

■■■ If, by mistake, an instrument as written fails to express the true intention or agreement of the parties, equity will grant reformation of the instrument so as to make it correctly express the agreement actually made. The rule applies to express inter vivos trusts as well as to other written instruments. *Ford v. Ford*, 492 S.W.2d 376 (Tex.Civ.App.Texarkana 1973, writ ref'd n. r. e.); *Roos v. Roos*, 203 A.2d 140 (Del.Ch. 1964); *In Re Trust Estate of LaRocca*, 411 Pa. 633, 192 A.2d 409 (1963); *Lissauer v. Union Bank & Trust Co.*, 45 Cal.App.2d 468, 114 P.2d 367 (1941); *Kiser v. Lucas*, 170 Md. 486, 185 A. 441 (1936); *Osborn v. Bankers Trust Co.*, 168 Misc. 392, 5 N.Y.S.2d 211 (1938); Restatement (Second) of Trusts

§ 333, p. 149 (1959) and comments; Bogert, Trusts and Trustees § 991, p. 419; § 51, p. 413; and, § 42, p. 291 (2d ed. 1962, 1965). The mistake may be shown by parol evidence. *Rattan v. Dicker*, 373 S.W.2d 306 (Tex.Civ.App.Dallas 1963, no writ); Bogert, Trusts and Trustees § 51, p. 413 (2d ed. 1965); 66 Am.Jur.2d Reformation of Instruments § 118, pp. 644, 645. And although a mutual mistake of the parties is required in most instances, if a settlor of a trust receives no consideration for the creation of the trust, a unilateral mistake on his part is sufficient. *In Re Trust Estate of LaRocca*, supra; Restatement (Second) of Trusts § 333 and Comment *a*. It is immaterial whether the mistake be one of fact or law. Any mistake of the scrivener which could defeat the true intention may be corrected in equity by reformation, whether the mistake is one of fact or law. *McClung v. Lawrence*, 430 S.W.2d 179 (Tex.1968); *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62 (1959); *Gilbert v. Smith*, 49 S.W.2d 702 (Tex.Com.App.1932, judgmt. adopted); *Rattan v. Dicker*, supra; *Ashby v. Gibbon*, 69 S.W.2d 445 (Tex.Civ.App.Amarillo 1934, no writ); 49 Tex.Jur.2d Reformation of Instruments § 30, p. 637, and cases cited; 66 Am.Jur.2d Reformation of Instruments § 21, p. 547. As stated by Pomeroy in his work on equity:

"If, . . . after making an agreement, in the process of reducing it to a written form the instrument, *by means of a mistake of law*, fails to express the contract . . . actually entered into, equity will interfere with the appropriate relief, . . . to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact. In this instance there is no mistake as to the legal import of *the contract actually made*; but the mistake of law prevents the real contract from being embodied in the written instrument. In short, if a written instrument *fails to express the intention which the parties had in making the contract which it purports to contain*, equity will grant its relief, . . . although the failure may have resulted *from a mistake as to the legal meaning and oper-*

*ation of the terms or language employed in the writing. . . .*" (Last emphasis supplied) 3 Pomeroy's Equity Jurisprudence § 845, pp. 298, 299, and authorities there cited.

In 76 C.J.S. Reformation of Instruments § 27, p. 357, the following is found:

" . . . the rule that a mistake of law is no ground for equitable relief applies only to cases where the contract as entered into speaks the true agreement of the parties, and does not apply where the contract is fully understood, but is incorrectly expressed in the writing *through ignorance or mistake as to the legal import of the language selected* by the parties for that purpose, so that, if by mistake the instrument does not express the true agreement or intention of the parties, it is immaterial whether the mistake is one of fact or of law . . . ." (Emphasis supplied.)

The fact that the written instrument is couched in unambiguous language, or that the parties knew what words were used and were aware of their ordinary meaning, or that they were negligent in failing to discover the mistake before signing the instrument, will not preclude relief by reformation. *San Antonio Nat. Bank v. McLane*, 96 Tex. 48, 70 S.W. 201 (1902); *Kelley v. Ward*, 94 Tex. 289, 60 S.W. 311 (1901); *Littlefield v. Clayton Bros.*, 194 S.W. 194 (Tex.Civ.App. Amarillo 1917), rev'd, 244 S.W. 509 (Tex. Com.App.1922, judgmt. adopted); *Snider v. Marple*, 168 Kan. 459, 213 P.2d 984 (1950); *Walnut Street Baptist Church v. Oliphant*, 257 Iowa 879, 135 N.W.2d 97 (1965); 66 Am.Jur.2d Reformation of Instruments § 21, p. 547 and cases cited; 76 C.J.S. Reformation of Instruments § 27, p. 359 and cases cited.

Appellees contend, however, that because the residuary trust in Mrs. Brinker's will eventually will pour over into the Brinker Family Trust, and Mrs. Brinker's will has now been probated, the Brinker Family Trust, so far as the pour over assets are concerned, has become testamentary and consequently it cannot be reformed. We disagree.

It is true that a testamentary disposition is not subject to reformation. *Jackson v. Templin*, 66 S.W.2d 666 (Tex.Com. App.1933, judgmt. adopted); 49 Tex.Jur.2d Reformation of Instruments § 15, p. 617; 3 Pomeroy's Equity Jurisprudence § 871f, pp. 404, 405 (5th ed. 1941), and cases there cited. But we hold that the Brinker Family Trust did not become testamentary by reason of Mrs. Brinker's residuary trust pour over.

Prior to the drafting of the Uniform Testamentary Additions to Trusts Act, there were two legal doctrines concerning the validity and nature of testamentary additions to inter vivos trusts. One was the doctrine of incorporation by reference, which held that the terms of the inter vivos trust became incorporated into the will by reference and became a part of it, thus rendering the trust testamentary insofar as the gift was concerned. See Annot., 12 A.L.R.3d 56, 101–102, and cases discussed. The other was the doctrine of independent significance, which held that the trust did not become a part of the will, but that the testamentary bequest or devise simply was added to and augmented the trust corpus to be administered as a part of the trust according to its provisions. Under that doctrine the trust provisions concerning disposition of the gift did not become testamentary. See Annot., 12 A.L.R.3d 56, 102–103, and cases cited. The Uniform Testamentary Additions to Trusts Act was designed to validate testamentary additions to trusts even though such trusts were amendable, and to prevent the trust provisions affecting such gift from becoming testamentary. The Act provides in part as follows:

" . . . the property so devised or bequeathed (a) *shall not be deemed to be held under a testamentary trust of the testator but shall become a part of the trust to which it is given and (b) shall be administered and disposed of in accordance with the provisions of the instrument . . .* setting forth the terms of the trust, . . .". (Emphasis supplied.)

Texas adopted the Uniform Act in 1961. The Texas version is as follows:

"By a will duly executed pursuant to the provisions of this Code, a testator may devise or bequeath property to the trustee of any trust (including an unfunded life insurance trust, even though the trustor has reserved any or all rights of ownership in the insurance contracts) the terms of which are evidenced by a written instrument in existence before or concurrently with the execution of such will and which is identified in such will, even though such trust is subject to amendment, modification, revocation or termination. The property so devised or bequeathed shall be added to the corpus of such trust to be administered as a part thereof and shall thereafter be governed by the terms and provisions of the instrument establishing such trust, including written amendments or modifications thereto made before the death of the testator. An entire revocation of the trust prior to the testator's death shall cause the devise or bequest to lapse." [1]

Although the Texas version does not specifically provide that such a gift will not be deemed to be held under a testamentary trust, in other respects it is essentially the same as the Uniform Act, and it specifically provides that the gift " . . . shall be added to the corpus of such trust to be administered as a part thereof and shall thereafter be governed by the terms and provisions of the instrument establishing such trust, . . .". We hold that the intention of the Texas Act was that the trust provisions would not become testamentary by reason of such a gift, but that the gift would simply augment the corpus of the trust and become a part of it.

Appellees assert that a reformation of the Family Trust would violate that portion of Section 58a which provides that a gift to a trust will be governed by the trust instrument *and any written amendments or modifications made before the death of the testator.* It is argued that to reform the Family Trust would be the equivalent of

1. Tex. Probate Code Ann. § 58a.

amending or modifying it after the death of Maureen Brinker. We cannot agree.

To amend or modify an agreement means to change it. *Morris v. The Broadview*, 328 Ill.App. 267, 65 N.E.2d 605 (1946); *State v. LeBlond*, 108 Ohio St. 41, 140 N.E. 491 (1923); *Board of Directors, Etc. v. Board of Education, Etc.*, 250 Iowa 1107, 97 N.W.2d 166 (1959). Reformation does not change the agreement; it enforces the agreement. It orders a change in the drafted instrument so that it will correctly express what has been the real agreement from its inception. *Colvocoresses v. W. S. Wasserman Co.*, 26 Del.Ch. 333, 28 A.2d 588 (1942); *Baldwin v. Equitable Life Assurance Society of U. S.*, 252 Iowa 639, 108 N.W.2d 66 (1961); *Walnut Street Baptist Church v. Oliphant*, supra; *Kufer v. Carson*, 230 N.W.2d 500 (Iowa 1975).

The excluded evidence on the issue of reformation is before us in the bill of exceptions, but as indicated in our summary of that evidence it is not so conclusive that it determines the issue as a matter of law and allows us to render a judgment. There is positive evidence of mistake; yet there are circumstances which bear upon the credibility and accuracy of the testimony which might lead reasonable minds to reject it. A fact issue has been created which requires resolution by a trier of fact. The judgment will therefore be reversed and remanded for a new trial.

In view of our disposition of the point concerning the exclusion of evidence, it is not necessary for us to consider appellants' other points.